**REVISED February 17, 2016**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-51012

United States Court of Appeals
Fifth Circuit

**FILED**

January 25, 2016

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

MICHAEL GLUK; MICHAEL BAKER,

Defendants - Appellants

Appeals from the United States District Court
for the Western District of Texas

Before JOLLY and JONES, Circuit Judges, and MILLS, District Judge.[1][*]

E. GRADY JOLLY, Circuit Judge:[1]

Michael Baker and Michael Gluk appeal their convictions for securities fraud. Because we agree with their evidentiary challenges, we vacate their convictions and remand for a new trial.[2]

---

[*] District Judge of the Northern District of Mississippi, sitting by designation.

[1] This opinion was originally filed on January 25, 2016. This corrected opinion only adds the final three sentences to footnote three.

[2] Because we reverse based on the evidentiary challenges, we do not reach the defendants' other challenges to their convictions.

No. 14-51012

I.

Michael Baker and Michael Gluk were, respectively, the CEO and CFO of ArthroCare, a medical device company.  Under their tenure (and, allegedly, with their knowledge) ArthroCare practiced "channel stuffing" with a related entity, DiscoCare.

"Channel stuffing" is a fraudulent scheme companies sometimes attempt, in an effort to smooth out uneven earnings—typically to meet Wall Street earnings expectations.  Specifically, a company that anticipates missing its earnings expectations will agree to sell products to a coconspirator.  The company will book those sales as revenue for the current quarter, increasing reported earnings.  In the following quarter, the coconspirator returns the products, decreasing the company's reported earnings in that quarter. Effectively, the company fraudulently "borrows" earnings from the future quarter to meet earnings expectations in the present.  Thus, in the second quarter, the company must have enough genuine revenue to make up for the "borrowed" earnings and to meet that quarter's earnings expectations.  If the company does not meet expectations in the second quarter, it might "borrow" ever-larger amounts of money from future quarters, until the amounts become so large that they can no longer be hidden and the fraud is revealed.

ArthroCare carried out exactly this fraud, with DiscoCare playing the role of coconspirator.  Over several years, ArthroCare fraudulently "borrowed" around $26 million from DiscoCare.  This "borrowing" occurred by directing DiscoCare to buy products from ArthroCare on credit, with the agreement that ArthroCare would be paid only when DiscoCare could sell those products. Although this can be a legitimate sales strategy, it was fraudulent here because DiscoCare purchased medical devices that it knew it could not sell reasonably soon for the sole purpose of propping up ArthroCare's quarterly earnings.  This fraud was carried out under the day-to-day supervision of John

2

No. 14-51012

Raffle, the Vice President of Strategic Business Units, and of David Applegate, another DiscoCare executive.

DiscoCare's business model (apart from the accounting fraud) was potentially wrongful, though no charges were brought. DiscoCare provided a medical device for which most insurers refused reimbursement. To sell its device, DiscoCare reached an agreement with plaintiffs' attorneys; this agreement resulted in the majority of DiscoCare's sales. Under this agreement, DiscoCare would treat clients of the attorneys. The plaintiffs' attorneys would then cite the expense of their clients' treatment as a reason for defendants to settle personal injury lawsuits. DiscoCare also allegedly illegally coached doctors on which billing codes to use, in an effort to increase insurance reimbursements. This practice allegedly went as far as instructing doctors to perform an unnecessary surgical incision to classify the treatment as a surgery. No charges were filed on any of this conduct.

ArthroCare subsequently purchased DiscoCare for $25 million, a price that far exceeded its true value (DiscoCare had no employees at the time). During this purchase, the fraud began to unravel, with media reports alleging accounting improprieties. To reassure investors, Gluk and Baker made several false statements during a series of conference calls. As evidence mounted, the audit committee of ArthroCare's board of directors commissioned an independent investigation by forensic accountants and the law firm Latham & Watkins. As a result of this investigation, the board determined that Raffle and Applegate had committed fraud and had misled Gluk and Baker. The board restated earnings, resulting in a significant drop in the value of ArthroCare stock, and fired Raffle and Applegate for their roles in the fraud. The board also fired Gluk, determining that he had been remiss in not detecting the fraud earlier. The board did not fire Baker.

No. 14-51012

The SEC investigated ArthroCare (both informally and formally) to determine the extent of the fraud. During this investigation, Raffle and Applegate exercised their Fifth Amendment right against self-incrimination to decline to answer questions. After its investigation, the SEC sued ArthroCare, Raffle, and Applegate for securities fraud; it did not sue Gluk or Baker. It did file a "claw-back" complaint against Gluk and Baker; this complaint stated that the SEC "does not allege that Baker and Gluk participated in the wrongful conduct" but instead determined that Raffle and Applegate "intentionally withheld" information from Gluk.

The government subsequently brought criminal charges, initially only against Raffle and Applegate. Raffle and Applegate pled guilty and agreed to testify against Gluk and Baker; the government then indicted Gluk and Baker for the channel stuffing. At trial, Raffle and Applegate testified that Gluk and Baker knew of the fraud; Gluk and Baker testified that they did not. The district judge excluded evidence of the Latham and SEC investigations. Conversely, the judge overruled objections from the defendants and allowed testimony about the uncharged medical fraud that allegedly took place at DiscoCare. The jury returned a guilty verdict. At sentencing, the court determined that Baker must forfeit his net proceeds (a different amount than the proceeds directly traceable to the fraud, see note 3 below) from selling ArthroCare stock during the period of the fraud, an amount equal to $22,165,030.78. This appeal followed.

## II.

Gluk and Baker argue that the district court's evidentiary rulings were incorrect in two ways: they kept evidence out that should have been let in, and it let in evidence that should have been kept out. We agree on both counts, and accordingly reverse the defendants' convictions.

No. 14-51012

We review the district court's evidentiary rulings for abuse of discretion, subject to harmless error review. *United States v. El-Mezain*, 664 F.3d 467, 494 (5th Cir. 2011).

We first consider the evidence the district court excluded. The district court excluded both the SEC and Latham investigations as more prejudicial than probative. Both investigations determined that Raffle and Applegate hid the fraud from Gluk and Baker; as all parties admit, the reports could have significantly affected the jury's view of the case. The debate is only over whether that effect would have been proper (in which case the reports were highly probative and should have been admitted) or improper (in which case the reports were highly prejudicial and were correctly excluded).

The government argues that the reports' influence would have been improper because both Latham and the SEC examined no more information than the jury did. According to the government, Latham and the SEC were essentially fact-finding bodies, no more capable than the jury of determining whether Gluk and Baker had committed accounting fraud. The government worried that the "jury may have [incorrectly] believed that the SEC and Latham attorneys were better positioned to make factual findings" and thus been improperly influenced by the Latham and SEC reports. In short, the jury may have been intimidated into relinquishing its judgment when its fair judgment should be the sole determinant of guilt or innocence.

Gluk and Baker respond that Latham and the SEC indeed *were* better positioned to make factual findings and that professional findings would have been highly probative of the defendants' culpability. Latham and the SEC are experts in understanding and evaluating financial fraud. The defendants point to multiple cases where the Fifth Circuit has held that administrative findings are admissible in subsequent criminal trials precisely because administrative expertise might aid the jury.

5

No. 14-51012

These cases trace back to *Smith v. Universal Services, Inc.*, 454 F.2d 154 (5th Cir. 1972).  In *Smith*, the court held that EEOC reports are admissible, even though they are not binding on the subsequent trial.  "The fact that an investigator, trained and experienced in the area of discriminatory practices and the various methods by which they can be secreted, has found that it is likely that such an unlawful practice has occurred, is highly probative of the ultimate issue involved in such cases." *Id.* at 157 (emphasis added).  Gluk and Baker point out numerous cases that have followed this same reasoning, both for the EEOC and other agencies.  *E.g.*, *Hodge v. Seiler*, 558 F.2d 284, 288 (5th Cir. 1977) (admitting a HUD report).

The government responds that these cases should be limited to the EEOC context, and should not apply to SEC investigations.  We disagree. Investigations into accounting fraud, like investigations into employment discrimination, can involve complex legal intricacies where expert administrative guidance can properly inform the jury.  As this case demonstrates, financial-fraud cases can turn on credibility determinations, a key providence of the jury.  The same, however, is true of discrimination cases, where liability so frequently turns on disputed questions of intent.  The EEOC's expertise can be helpful; so can the SEC's expertise.

We accordingly hold that the Latham and SEC reports are likely to have a proper and appropriate influence on a jury's deliberations by providing it with expert assistance regarding the plausibility of expert testimony.  The government acknowledges that the reports could have held significant weight to the jury.  We agree, and thus conclude that the exclusion of these reports was not harmless error.  We therefore hold that the district court abused its

discretion and committed reversible error by refusing to admit the reports.[3]
Accordingly, we reverse and remand based on this error.

Second, Gluk and Baker argue that the district court erred by admitting evidence of uncharged fraud that purportedly took place at DiscoCare. Baker argues that:

> The [government's] strategy, from evidence to argument, was clear. The government recognized an obvious truth: accounting fraud is bland. A straightforward attempt to prove an accounting fraud case would be difficult, both because the rules of accounting contain ample gray area and also because jurors might well be too bored to care. In order to convict, jurors need to be outraged, and few jurors are so moved by outsized accounts receivable and improper revenue recognition. In order to spark a sense of outrage, the prosecution went outside the charges proper. It went to the DiscoCare fraud and its lurid details of needless incisions performed at the behest of Florida ambulance chasers.

The defendants argue that this evidence was impermissible character evidence and, in any event, was more prejudicial than probative. The government arguably intended to create the improper inference that Gluk and Baker were bad people involved in shady operations and thus were the sort of people who might have tolerated accounting fraud. This type of attempt to demonstrate the character of the defendant is not permissible under Federal Rule of Evidence 404.

---

[3] The parties also disagree about whether the SEC report is hearsay or is admissible under Federal Rule of Evidence 803(8)(A)(iii). *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988). We need not reach this issue because, even if the reports were inadmissible for their truth, they would still have been admissible to impeach Raffle and Applegate. Even as impeachment evidence, the reports may have had a decisive effect and thus it was error to exclude them. Further, the parties agree that Rule 803(8)(A)(iii) does not apply to the Latham report. Thus, that report will be admissible only to the highly limited degree that it serves to impeach the trial testimony of specific witnesses. Finally, we do not address whether portions of the Latham report—even if admissible as impeachment—might be excluded under 704(b), as this issue was not raised by the parties.

No. 14-51012

The government, however, responds that activities at DiscoCare were intrinsic to the charges of wire fraud and were highly relevant. The government argues that details about the activities at DiscoCare explain why Gluk and Baker would make misleading statements to investors (i.e., to hide those salacious details). Further, evidence about how involved Gluk and Baker were with the DiscoCare model helps show that they were involved in day-to-day operations; this involvement is relevant to the credibility of their claim to have known nothing about Raffle's and Applegate's fraud.

At least some evidence of the DiscoCare conduct is undeniably relevant to ArthroCare's accounting fraud. At the same time, however, admitting limited evidence does not license the government to introduce the magnitude of testimony it elicited, nor to emphasize the DiscoCare fraud, not chargeable to the defendants, in jury arguments. Allowing this breadth of testimony was error. The district court could have done more to police the line between proper and improper evidence; it should have been careful to prevent the government from dwelling on the salacious details of DiscoCare's business practices that could not be charged to the defendants. Because we reverse on other grounds, we need not determine whether this error independently justifies reversal or, conversely, whether it would have been harmless error in the absence of the reversible error we previously identified.

### III.

Accordingly, for the reasons stated, we VACATE Baker and Gluk's convictions, and REMAND for a new trial.[4]

---

[4] Because we reverse the convictions, we do not reach Baker's challenge to the forfeiture calculation. *Forfeiture* is not a *fine*. The purpose of a forfeiture is to require defendants to give up the proceeds of their crimes, not to punish them for those crimes. *See United States v. Hatfield*, 795 F. Supp. 2d 219 (E.D.N.Y. 2011). Requiring forfeiture of the entire value of stock sold would require forfeiting compensation, even when that compensation is not traceable to fraud.

No. 14-51012

VACATED and REMANDED.