[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-12728

_____

Nos. 1:08-cv-21063-JIC; 1:07-cv-22459-JIC-BSS

ELOY ROJAS MAMANI, *et al.*,

Plaintiffs-Appellants,

versus

GONZALO DANIEL SÁNCHEZ DE
LOZADA SÁNCHEZ BUSTAMANTE,
JOSÉ CARLOS SÁNCHEZ BERZAÍN,

Defendants-Appellees.

_____

On Appeal from the United States District Court
For the Southern District of Florida

_____

(August 3, 2020)

Before ROSENBAUM, TJOFLAT, and HULL, Circuit Judges.

TJOFLAT, Circuit Judge:

This case bears a long and complicated history—both procedurally and

factually.  Plaintiffs are the relatives of eight Bolivian civilians killed in 2003

during a period of civil crisis in Bolivia.  Clashes between military forces and

civilians caused many deaths and injuries.  Plaintiffs sued the former President of

Bolivia, Gonzalo Daniel Sánchez de Lozada Sánchez Bustamante ("President" or

"Lozada"), and the former Defense Minister of Bolivia, José Carlos Sánchez

Berzaín ("Defense Minister" or "Berzaín"), for the extrajudicial killings and

wrongful deaths of their family members based on their alleged conduct in

perpetuating the crisis.

Plaintiffs based their extrajudicial-killing claims on the Torture Victims

Protection Act ("TVPA"), which provides that a person who "subjects an

individual to extrajudicial killing shall, in a civil action, be liable for damages to

the individual's legal representative."  28 U.S.C. § 1350 note § 2(a)(2).  We have

previously held that the TVPA is not restricted to claims based on direct liability

and that legal representatives can recover based on theories of indirect liability,

including aiding and abetting, conspiracy, agency, and command responsibility.

*See Doe v. Drummond Co.*, 782 F.3d 576, 603 (11th Cir. 2015).  Plaintiffs asserted

claims against Lozada and Berzaín (collectively, "Defendants") under each of

these theories of indirect liability.  In addition, Plaintiffs asserted wrongful-death

claims under Bolivian law.

Over ten years after Plaintiffs filed their first complaint, Plaintiffs' claims

went to a jury.  The jury rendered a split verdict.  The jury ruled for Plaintiffs on

the TVPA claims, finding that each death was an extrajudicial killing and finding

Lozada and Berzaín liable under the command-responsibility doctrine.  The jury

awarded a total of $10 million in compensatory damages to Plaintiffs on their

TVPA claims.  The jury found for Defendants on the wrongful-death claims,

determining that no death was a "willful and intentional killing by a Bolivian

soldier."  After the jury had rendered its verdict, the District Court granted

Defendants' renewed motion for judgment as a matter of law on the TVPA claims,

determining that Plaintiffs had failed to present a sufficient evidentiary basis that

the deaths were extrajudicial killings.

Plaintiffs appealed.  On appeal, we are presented with three questions.  First,

we must assess whether the evidence supports Plaintiffs' TVPA claims.  Second,

we must decide whether the District Court abused its discretion by admitting into

evidence State Department cables with alleged hearsay.  And third, we must

determine whether the District Court erred when it refused to give Plaintiffs'

requested jury instruction on the wrongful-death claims.

In answering the first question, we determine that the District Court

conflated the standard for an extrajudicial killing with the theory of liability tying

Defendants to the decedents' deaths.  We further hold that evidence of deaths

caused by a soldier acting under orders to use excessive or indiscriminate force

could provide a legally sufficient foundation to support a TVPA claim.  We vacate

and remand the case for the District Court to determine, in the first instance and under the correct standard, whether Plaintiffs put forth sufficient evidence to show that the deaths were extrajudicial killings, and, if so, whether there is sufficient evidence to hold Defendants liable for such killings under the command-responsibility doctrine.

As for the wrongful-death claims, we determine that the District Court erroneously admitted the State Department cables.  Given our resolution of the second issue, we need not decide the third question.  We vacate and remand the case for a new trial on the wrongful-death claims.

I.

As we mentioned before, this case has a lengthy history.  The events that gave rise to this suit occurred in Bolivia during the Fall of 2003 and the parties have twice been before this Court.  We outline that history below.

A.

In 2011, we issued an opinion in *Mamani v. Berzain* ("*Mamani I*"), 654 F.3d 1148 (11th Cir. 2011).  We explained the case as follows:

> Plaintiffs' claims arise out of a time of severe civil unrest and political upheaval in Bolivia—involving thousands of people, mainly indigenous Aymara people—which ultimately led to an abrupt change in government.  Briefly stated, a series of confrontations occurred between military and police forces and protesters.  Large numbers of protesters were blocking major highways, preventing travelers from returning to La Paz, and threatening the capital's access to gas and presumably other needed things.  Over two months, during the course

4

of police and military operations to restore order, some people were killed and more were injured.  The President ultimately resigned his responsibilities, and defendants withdrew from Bolivia . . . .

Plaintiffs filed suit in federal district court against the President and Defense Minister personally but on account of their alleged acts as highest-level military and police officials. Plaintiffs do not contend that defendants personally killed or injured anyone.  In their corrected amended consolidated complaint . . ., plaintiffs brought claims under the ATS, asserting that defendants violated international law by committing extrajudicial killings; by perpetrating crimes against humanity; and by violating rights to life, liberty, security of person, freedom of assembly, and freedom of association.  Plaintiffs sought compensatory and punitive damages.

*Id.* at 1150–51 (footnote omitted).

*Mamani I* was a limited interlocutory appeal under 28 U.S.C. § 1292(b).  We granted Defendants' petition to appeal the District Court's denial of their motion to dismiss Plaintiffs' complaint for failure to state a claim under the Alien Tort Statute ("ATS").[1]  *Id.* at 1151.  The ATS enables aliens to sue for torts "committed in violation of the law of nations."  *Id.* at 1153, 1154 n.7.

We reversed the District Court's ruling.  *Id.* at 1157.  We held that Plaintiffs, in their 2008 amended complaint, had "not pleaded facts sufficient to show that anyone—especially *these defendants*, in their capacity as high-level officials—

---

[1] The Complaint included claims under the TVPA and claims for wrongful death, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence, but those issues were not considered in the limited interlocutory appeal. *Mamani I*, 654 F.3d at 1151 n.1.  Defendants also appealed the District Court's conclusions that the political-question doctrine did not bar suit and that Defendants lacked sovereign immunity.  *Id.* 1151 & n.3.  Because we held that Plaintiffs' complaint failed to state a claim under the ATS, we did not address Defendants' other arguments on appeal.

committed extrajudicial killings" under the ATS. *Id.* at 1155. In order to state such a claim, we held that the complaint must contain non-conclusory factual allegations of "the specific things the defendant is alleged to have done" and those things "must violate what the law already clearly is." *Id.* at 1152. "High levels of generality" and "general propositions" will not suffice. *Id.* We also cautioned that the ATS does not embrace "strict liability akin to respondeat superior for national leaders at the top of the long chain of command." *Id.* at 1154.

We described Plaintiffs' factual allegations as the following: that Defendants had "order[ed] Bolivian security forces . . . to attack and kill scores of unarmed civilians;" that Defendants had "exercised command responsibility over, conspired with, ratified, and/or aided or abetted subordinates in the Armed Forces . . . to commit acts of extrajudicial killing;" that Defendants had "met with military leaders, other ministers in the Lozada government to plan widespread attacks involving the use of high-caliber weapons against protestors;" and that Defendants "knew or should have known of the pattern and practice of widespread, systematic attacks against the civilian population." *Id.* at 1153. Defendants, in other words, "knew or should have known of wrongful violence taking place and failed in their duty to prevent it." *Id.* We concluded that these allegations were "[e]asy to say about leaders of nations," and, therefore, Plaintiffs needed factual support of more specific acts by either Lozada or Berzaín. *Id.* at 1154.

6

And before we could determine whether Lozada or Berzaín could be held indirectly liable, we had to determine whether Plaintiffs had pleaded a cognizable wrong. *Id.* Rather than attempting to define the boundaries of "the law of nations" under the ATS, we relied on the definition of "extrajudicial killing" from a related statute, the TVPA, and assumed for the purposes of our discussion that any action that violated the TVPA would also violate the ATS. *Id.* at 1154 n.7.

Based on this understanding, we held that the allegations in the complaint that suggested that the military had targeted some civilians were insufficient to show that an extrajudicial killing had occurred. *Id.* at 1155. While we parroted the District Court's statement that "it is not clear what constitutes an extrajudicial killing," we explained that, at a minimum, an extrajudicial killing is "'deliberate' in the sense of being undertaken with studied consideration and purpose." *Id.* at 1155 & n.8. Alternative explanations, other than extrajudicial killings, were consistent with the facts alleged. *Id.* at 1155. "[F]or instance, the alleged deaths are compatible with accidental or negligent shooting (including mistakenly identifying a target as a person who did pose a threat to others), individual motivations (personal reasons) not linked to the defendants, and so on." *Id.* Even with a favorable reading of the allegations, we still determined that the "decedents' deaths could plausibly have been the result of precipitate shootings during an ongoing civil uprising" rather than extrajudicial killings. *Id.*

While we left open the possibility that the facts—as alleged—could indicate a deliberated killing by "someone," e.g. the shooter, we held that the complaint lacked facts connecting Lozada and Berzaín to the wrongdoing. *Id.* at 1155 n.8. While we did not rule out the possibility of indirect liability through the ATS, we determined that the complaint's allegations were too conclusory to state such a claim against Lozada or Berzaín. *Id.* To decide whether Plaintiffs had stated a claim "against *these* defendants, we must look at the facts connecting what these defendants personally did to the particular alleged wrongs." *Id.* When we looked, we failed to find any non-conclusory allegations regarding specific acts by Lozada or Berzaín. *Id.* at 1155. Pursuant to our instructions, the District Court dismissed Plaintiffs' ATS claims. *Id.* at 1157.

## B.

Shortly thereafter, Plaintiffs filed a second amended complaint. They again brought claims under the ATS, the TVPA, and Bolivian law, with nearly one hundred additional paragraphs of allegations, including allegations that Defendants entered office with a preconceived plan to kill civilians to implement their economic policies[2] and more specific allegations about Lozada's and Berzaín's control of the Bolivian military forces. Defendants again moved to dismiss. The

---

[2] Specifically, Plaintiffs allege that one of Lozada's objectives was to export Bolivian natural gas to the United States and Mexico through Chile, a policy that both Defendants allegedly anticipated would be unpopular and trigger widespread political protests.

District Court dismissed Plaintiffs' ATS claims, concluding that it lacked subject-matter jurisdiction because the relevant conduct had occurred outside the United States. The District Court refused to dismiss Plaintiffs' other claims, rejecting Defendants' exhaustion arguments and ruling that the second amended complaint contained sufficient factual allegations to state plausible claims for relief under the TVPA.

That order became the subject of a second interlocutory appeal before this Court. *Mamani v. Berzain* ("*Mamani II*"), 825 F.3d 1304 (11th Cir. 2016). Pursuant to 28 U.S.C. § 1292(b), we granted Defendants' petition to appeal two issues: (1) "whether the exhaustion requirement in § 2(b) of the TVPA bars the plaintiffs' claims" and (2) "whether the plaintiffs have failed to state claims for relief under the TVPA." *Id.* at 1308.

We quickly disposed of the first issue, determining that Plaintiffs had fulfilled the exhaustion prerequisite and that their success in a foreign forum did not bar their TVPA claims under the plain language of § 2(b). *Id.* at 1309–12.

We declined to determine the second issue. *Id.* at 1313. We opted not to exercise our discretionary authority under 28 U.S.C. § 1292(b) because Defendants' certified question did not pose a "pure question of law." *Id.* at 1312. We explained that determining whether Plaintiffs had stated claims for relief under the TVPA posed case-specific questions that would require an intense analysis of

9

the lengthy complaint. *Id.* Such a determination would require not only "scrutiniz[ing] the scores of factual allegations," but also "assess[ing] the clusters of allegations" for each claim against both Defendants. *Id.* at 1313. That analysis, we concluded, is more appropriate for the trial court. *Id.* We affirmed the District Court's denial of Defendants' motion to dismiss the TVPA claims on exhaustion grounds. *Id.*

## II.

Plaintiffs' TVPA and Bolivian wrongful-death claims ultimately went to trial. The jury heard from nearly forty witnesses over a three-week trial about the deaths of the eight victims in September and October 2003. We briefly summarize some of the relevant testimony regarding the eight decedents' deaths and then explain the post-verdict proceedings. Consistent with our standard of review, which we describe in the next section, we view all evidence in the light most favorable to Plaintiffs.

## A.

### 1.

Eight-year-old Marlene Nancy Rojas Ramos ("Marlene") was shot and killed on September 20, 2003, in Karisa. Karisa is a district of Warisata, a village northwest of La Paz.

The jury heard testimony from Marlene's parents about her death. Marlene's mother, Etelvina, testified that Marlene was playing inside their home when she was struck by a bullet. Etelvina, who was in the room when her daughter was shot, testified that she heard a noise, "boom boom," saw blood coming out of Marlene's chest, and saw a bullet hit the wall and then fall on the floor. Etelvina said that as she was covering Marlene's wound, she looked out the window and saw camouflaged military soldiers running away after the shot. Etelvina testified that after her daughter was shot, she and her other children went downstairs because they were afraid for their safety.

Marlene's father, Eloy, testified that there was a roadblock in La Paz on September 20, but there were "no protests" in Warisata. Eloy testified that the military arrived in Warisata at noon and "started shooting with firearms" in the early afternoon. He could see the soldiers shooting from his house. Eloy fled his house that afternoon and was not at home when his daughter was shot. He testified that he and other civilians were hiding out at a nearby hill and that he never saw anyone shoot at the soldiers nor did he see "anybody that was not a soldier shooting any firearms." He testified that the military continued shooting throughout the day until 10 p.m. He also stated that, the day after Marlene was killed, there were shells from firearms "behind my house and all over the place" and that they were the same type of shell that was found in his home.

11

In addition, Edwin Aquilar Vargas ("Aquilar"), a soldier stationed in Warisata, testified that his squadron moved from a base in Achacachi to Warisata. Aquilar testified that, on his arrival in Warisata at approximately 3 p.m., he saw teargas, heard dynamite blasts, and heard bullets in the area. He said that the police already in Warisata were shooting non-lethal ammunition. He saw injured police and claimed that the police were asking the soldiers for help, to shoot at people in the mountains. He also saw civilians "screaming and throwing rocks" and lighting tires on fire. He testified that when the police first asked for help, the soldiers did not shoot because they did not have an order from their superiors to do so.

At some point, a member of Aquilar's unit was shot and killed. After the soldier was killed, Aquilar's superior, Lieutenant Miranda, ordered that the squadron switch from nonlethal ammunition to lethal ammunition. Then, Aquilar testified that, "from the moment we entered the village," Lieutenant Miranda "ordered that we had to shoot at anything that moved." He stated that the instructors "would shoot at anything that moved or screamed." "Every time," Lieutenant Miranda, whom Aquilar was required to follow, "went forward or came across a square, he would shoot bursts of bullets." According to Aquilar, Lieutenant Miranda was shooting "[a]t everything," including people, windows, and buildings. Aquilar also saw other instructors shooting and special forces

12

"shooting back and forth" into the homes.  During the several hours that it took for Aquilar's squadron to move through Warisata, he never saw a civilian shooting at the military soldiers.

On cross-examination, Aquilar clarified that the orders were for "anyone who moved, you were ordered to shoot below the belt," "anyone with dynamite or guns, you were ordered to shoot above the belt."  He testified that he understood that the orders were designed to minimize the risk that unarmed people would be killed but concluded that "there were civilian casualties."

The jury was given an investigative report that there was an ambush on a military convoy transporting trapped travelers through Warisata that day, which led to "an armed confrontation," and that there were "injuries and fatalities" as a result. The jury also heard from Benjamin Smith, an American who was in Bolivia at that time.  He testified that he was in Sorata, Bolivia in September and knew of blockades that were hindering access to La Paz.  On September 20, he got onto the middle bus of approximately fifteen buses and other vehicles "escorted by military vehicles" to make the trip from Sorata to the airport in La Paz.  Smith described his experiences along the route.  He testified that the caravan stopped outside of Warisata for approximately two hours in the late afternoon.  He did not see anything happening, but he heard gunshots ahead.  After a couple of hours, the

13

gunfire stopped, and the caravan safely went through Warisata and he did not see or hear any other gunshots.  Smith arrived in La Paz early the next day.

2.

On October 12, 2003, Lucio Santas Gandarillas Ayala ("Lucio") was shot in the Senkata area of El Alto.  The jury watched a video deposition from Luis Castaño Romero ("Castaño"), who witnessed Lucio's death.

Castaño walked from the Senkata plant toward a nearby college to look for his father around midday on October 12.  He saw approximately ninety to a hundred soldiers inside the plant.  He also saw a large group of people protesting and blocking the road but did not see any civilians with guns.  Castaño testified that as he was standing near the college, among the protestors, he saw a yellow tractor leave the plant and come toward the protestors.  He testified that there were soldiers inside the tractor, and one got out and "started shooting, shooting up in the air."  He did not see anyone shoot at the tractor.  As the military started shooting, some of the protestors, including Castaño, fled down the Kenko alleyway.  Castaño testified that, at one point, he glanced back and saw a military officer run to a corner and start shooting "a whole shower or rain of bullets."  He testified that he couldn't see whether anyone was shooting from the alleyway back at the officer because he was running away.

14

Castaño kept running, stopped a second time, and turned around.  He testified that he saw five officers about a block and a half away at the railroad tracks "positioning themselves to shoot."  One was "standing up positioned to fire," one was "on his knee, bent knee, positioned to fire," and the "others had positioned themselves in a shooting position" on a mound.  They were "pointing [their guns] at the civilians."  He testified that he couldn't see what kind of guns they had because he was "so far away . . ., but I could see that they were pointing."

He also testified that there were helicopters circling the area.  Castaño stated that he watched as a man, later identified as Lucio, leaned out of a street kiosk and was shot.  Castaño admitted that he "couldn't tell whether it had been any of the military that gave -- you know, gave that shot or whether it was coming from the helicopter because all I did was hear the shot."  Castaño was himself shot in the leg shortly thereafter.  He testified that he didn't see the civilians do anything to provoke the military—"Some were escaping.  Some were just standing.  Some were walking."[3]

Aquilar testified that he was deployed near the Senkata plant sometime after being in Warisata.  His unit and other soldiers were positioned on a bridge above a road leading to the Senkata plant with civilians around.  Aquilar testified that

---

[3] During his video deposition, Castaño drew a map depicting the Senkata plant, the main avenue, the college, the Kenko alleyway, the position of the military officers, his position, and the kiosk.

15

Lieutenant Miranda first shot gas grenades toward the approaching civilians and "when the . . . gas grenades didn't explode, he ordered us to shoot." Specifically, Aquilar testified that Lieutenant Miranda ordered the soldiers to "shoot down at the people who were under the bridge." Aquilar testified that he and some of the other soldiers did not shoot because their families lived in that area. Aquilar also testified that, when members of his unit didn't start shooting, Lieutenant Miranda "got the musket and shot at us" and ultimately "exchanged us with the other group of [the] unit." The replacement group followed Lieutenant Miranda's orders and started shooting.

The jury also heard evidence that protestors had imposed major blockades around El Alto. One State Department cable summarized that "[p]olitical violence surged over the October weekend, particularly in El Alto" and that "La Paz remains virtually cut off from the rest of the country by the mob's application of El Alto's 'tourniquet.'" Witnesses testified that the "streets were blocked" and that, as of October 9, 2003, the entire city was "shut down." The investigative report that described the ambush in Warisata also mentioned "attacks in the Senkata area of El Alto on the tanker trucks transporting gasoline to the city of La Paz" and that, in both cases, the "mobilized civilian population was armed with Mauser rifles and dynamite."

3.

Another three decedents, Roxana Apaza Cutipa ("Roxana"), Marcelino Carvajal Lucero ("Marcelino"), and Teodosia Morales Mamani ("Teodosia"), were shot in the Río Seco region of El Alto on October 12, 2003. Family members who witnessed each death testified. In addition, the jury heard from two priests and a captured civilian about the events in the Río Seco area.

Roxana's brother, Guzman Apaza Cutipa, testified that he witnessed Roxana's death on the roof of their cousin's house in El Alto. Roxana was shot in the head. He remembered that there were "protests and people on the streets." He and his sister went to the roof to look out onto the street because they heard "noise and sounds and screams." When asked whether he could see the military, Guzman responded "Not exactly. But we could see tanks and trucks that were driving on the avenue." He also said that he could see people fleeing from the military. He testified that he did not see any civilians with weapons.

Relatives who witnessed Marcelino's and Teodosia's deaths testified that they saw armed soldiers patrolling the Río Seco area. Marcelino's widow, Juana Valencia de Carvajal, testified that at the time her husband was killed, she was looking at the street outside of her house and saw armed soldiers on three military trucks "in shooting positioning" and "ready to shoot." She noticed that there was a "lot of noise" and the street "was blocked with stones and glass and tires on fire

17

and metal pieces." Although she didn't actually see the shot that killed Marcelino, she testified that she saw him fall and saw the bullet.[4]

Similarly, Beatriz Apaza Morales, Teodosia's niece, testified that before her aunt was shot, she saw many soldiers carrying weapons that "[t]hey would aim at us when we wanted to look [out] the window" and say "[g]et inside, get inside." Although none of the soldiers shot at her when she looked out the window, she testified that "[t]hey aimed at us, both from across the way as well as right there." Teodosia attempted to leave the house and went down to the front door. Beatriz saw a man fall on the street and then, "almost at the same moment," Teodosia came back upstairs. Beatriz testified that her aunt kept repeating "[h]e killed him, he killed him." Very "quick[ly]" after, Teodosia was praying near the living room window when she was shot by a bullet that came through the wall.[5] Beatriz testified that her mother then went to the front door and the soldiers also "aimed at her." Teodosia's husband testified that, after he learned she had been shot, he went to the local clinic and attempted to transport her to the Juan XXIII Hospital. He said that they were unable to get very far because "the streets were blocked" and that protestors impeded their passage because ambulances had previously brought in gas.

---

[4] Plaintiffs published a photo of the house where Marcelino and Juana lived.
[5] Plaintiffs published a photo of the living room. Beatriz pointed to where she was standing and where Teodosia was shot.

Father Zabala Velasquez also testified about his experience in El Alto that day. He testified that in the morning, "vigils" were held to "protect the area, the neighborhood, to prevent the military from entering" and ditches were dug. He, along with approximately fifty people, participated in a march toward Avenida Juan Pablo Segundo. He testified that he did not see any civilians with firearms in the area. He had no knowledge of any soldiers killed in El Alto.

The jury also heard from another priest located in El Alto. Priest Soria Paz ("Soria") testified there was a civic strike, including blockades, in El Alto during October 2003, which prevented movement. As of October 9, 2003, the entire city was "shut down." He saw barbed wire on some streets, tires being burnt on street corners, stones in the street, and ditches along the roads to hinder mobility. He testified that at times it was difficult to walk through the streets and that people were demonstrating. On the night of October 11, 2003, Soria heard firecrackers and shots near the parish. The next day, "El Alto had been militarized." That afternoon, he heard—but did not see—gunfire coming from the Río Seco bridge. He saw soldiers near the parish, but he did not see the military shooting nor did he observe anyone being harmed by the military on October 12, 2003. He also did not see any civilians with firearms. Defendants also elicited testimony that Soria had called for Lozada's resignation in October 2003 and was later offered a candidacy for El Alto city council in the successor administration.

19

The jury heard testimony that soldiers in the area were under orders "to shoot at the civilians."  An eyewitness, Ela Trinidad Ortega Tarifa ("Ortega"), testified that she heard an officer give that order, and saw that when one conscript refused to shoot, an officer grabbed the conscript's gun and shot him instead. Ortega also testified that when she was captured by three soldiers, one kicked her and the others pleaded with her to remain quiet because they were being "forc[ed]" to hurt civilians.  That group then ran after another young man and beat and shot him.  She also testified that during October 12 and the days prior, she never saw any civilians with firearms. [6]

4.

Two other decedents, Arturo Mamani Mamani ("Arturo") and Jacinto Bernabé ("Jacinto"), were shot and killed in the Ánimas Valley, south of La Paz, on October 13, 2003.  Arturo's son, Gonzalez Mamani Aguilar ("Gonzalez"), testified about witnessing both deaths.[7]

Arturo was shot while he and Gonzalez were on their way to plant potato seeds and wheat.  Gonzalez testified that he saw "military men . . . going down shooting in every direction."  The soldiers "positioned themselves in a firing

---

[6] Ortega's testimony was accompanied by two maps of the area.

[7] Gonzalez was on a different hill than his father, approximately 200 meters away.  The jury was shown a satellite image of the area.  Gonzalez pointed out the locations of himself, his father, Jacinto, and the military.  Plaintiffs also published a video of the area.

20

position" and "were shooting everywhere." Gonzalez saw his father attempt to hide under straw and then heard him scream when he was shot.

After witnessing his father being shot, Gonzalez slid slightly down a hill and laid next to Jacinto, who was also attempting to hide from the soldiers. Gonzalez testified that not even twenty minutes passed before he felt Jacinto's blood spatter across his face and he realized that Jacinto had been shot. Gonzalez "moved a little bit further down" to better hide himself in the large plants "[b]ecause every time the straw would move, [the soldiers] would fire." Over the next hour or so, Gonzalez saw two other men shot. Gonzalez eventually made his way back to his father's body and saw a helicopter before finally fleeing to safety. During all of this, the military kept shooting.

The jury also heard from a Bolivian soldier, Jose Limber Flores Limachi ("Flores Limachi"), who was stationed in Ánimas Valley that day. A fellow soldier in his unit, Edgar Lecona, had been shot and killed while on patrol that morning. Flores Limachi testified that, after Lecona was shot, Captain Dieter Belmonte ordered the soldiers to change from nonlethal ammunition to lethal ammunition and ordered the soldiers to shoot civilians. Flores Limachi testified that his unit followed Captain Belmonte's orders. After approximately forty-five minutes of shooting, Flores Limachi's unit started climbing the hills and shooting at civilians. The soldiers were "forbidden to approach" injured civilians. Flores

21

Limachi testified that, from the time Captain Belmonte gave the order to the time his unit left later that day, he never saw civilians shooting at the soldiers nor did he see any civilians with firearms.

Defendants introduced a police statement signed by Flores Limachi on October 13, 2003, to impeach his testimony.[8]  In it, Flores Limachi states that his unit was moving from the Military College to the Laguana de Uni on the morning of October 13, 2003.  The soldiers stopped to remove a blockade at around 10:20 a.m. when "100 people . . . gathered on the hill" and "40 people . . . gathered farther down" began shouting at the soldiers and throwing "rocks, bottles[,] and dynamite."  The report also says that Captain "Belmonte ordered us to protect ourselves and not return fire at the blockaders' attacks."  Flores Limachi's statement also describes the aftermath of Lecona's death, stating that gunshots were coming from the hill and that Captain Belmonte told the "soldiers to get down on the ground since the blockaders were firing ammunition and ordered us to load the ammunition."  Flores Limachi testified that the information in the statement was not true and accurate.  He testified that he and three officers were questioned together, that he did not have an opportunity to read the statement

---

[8] The District Court rejected Defendants' attempt to admit the statement under Federal Rule of Evidence 803(2).  It was admitted for impeachment purposes.

22

before signing it, and that his commanding officers ordered him to sign the statement.

5.

Raúl Ramón Huanca Márquez ("Raúl") was shot in Ovejuyo, a town south of La Paz, on October 13, 2003.  The jury watched video depositions from Juan Carlos Pari Cuti ("Pari") and from Flores Limachi.

Pari, a resident of Ovejuyo, witnessed Raúl's death.  He testified that he noticed the military come into Ovejuyo because he heard shots.  Pari was inside his house looking out his window and saw "12 or 15" soldiers on the bridge that was located about 200 meters away, "lower down in front of [his] house."[9]  He first saw the soldiers rapidly shooting up toward a hill "where there [were] some youths."  He testified that he could not see what was happening on the hills.  Then, he saw Raúl (an "older" person) and three young men come out into the street about half a block in front of his house.  After Raúl and the other people came out onto the street, Pari saw the soldiers change the direction of their shooting.

Pari saw Raúl grab onto a post and heard the soldiers shouting.  He saw that "there were not many people around, and the soldiers, they were shooting, and they shot at him."  Pari saw Raúl fall.  Pari also testified that he did not see any civilians

_____

[9] During the video deposition, Pari drew a map that included indicators for his house, the street, the bridges, the river, where the soldiers were positioned, where the other young men were located, where Raúl fell, and the direction of the shots being fired by the military.

with guns in Ovejuyo on October 13 or before that day, nor did he see civilians attacking the military in any way. He also testified that there were no roadblocks in Ovejuyo.

Flores Limachi, whose unit moved from Ánimas Valley to Ovejuyo that day, testified that the soldiers shot at civilians in Ovejuyo to clear the way back to the military college.

B.

The jury was asked to decide two sets of claims for each Plaintiff. The first—the TVPA claims—asked the jury to determine, for each of the eight decedents, whether the "death was an extrajudicial killing by a Bolivian soldier." If the jury answered yes,[10] they were instructed to determine whether or not Lozada is liable for the extrajudicial killing because he (1) "had command responsibility over the Bolivian soldier," (2) "conspired with one or more individuals to commit the extrajudicial killing," or (3) had an "agency relationship" with the Bolivian soldier. The jury was asked to make the same liability determination for Berzaín. The second set of claims—the wrongful-death claims—asked the jury whether, for each decedent, "the death was a willful and

---

[10] If the jury answered no, they were directed to skip to Question 8, which dealt with the wrongful-death claim.

intentional killing by a Bolivian soldier." If the jury answered yes,[11] they were to determine whether Lozada or Berzaín had "willfully used a Bolivian soldier who killed [the decedent] as an instrument to intentionally kill [the decedent]."

The jury answered yes to the extrajudicial-killing question for every decedent. The jury found both Lozada and Berzaín liable for each killing based on the command-responsibility doctrine. The jury did not find Lozada or Berzaín liable under the conspiracy or agency theories.

The jury answered no to the wrongful-death question for every decedent, determining that no death was "a willful and intentional killing by a Bolivian soldier." Because they did not find that a predicate act had occurred, the jury did not address whether or not Lozada or Berzaín were liable for the death.

Prior to the jury's verdict, and again after it was rendered, Defendants moved for judgment as a matter of law under Federal Rule of Civil Procedure 50 on the TVPA claims. The District Court granted Defendants' renewed motion for judgment as a matter of law, determining that Plaintiffs had failed to present any evidence that the decedents' deaths were "deliberated killings."

This appeal followed. Plaintiffs assert that the District Court erred by granting judgment as a matter of law for Defendants on the TVPA claims. In

---

[11] If the jury answered no, they were directed to skip to Section C, which dealt with damages.

addition, Plaintiffs demand a new trial on their wrongful-death claims because they contend that the District Court erred by (1) admitting State Department cables with alleged hearsay and (2) refusing to give Plaintiffs' requested jury instruction.  We take each issue in turn.

## III.

We review a district court's ruling on a motion for judgment as a matter of law *de novo*, applying the same standard that the district court applied.  *Royal Palm Props., LLC v. Pink Palm Props., LLC*, 950 F.3d 776, 782 (11th Cir. 2020). Federal Rule of Civil Procedure 50 allows a district court to grant a motion for judgment as a matter of law if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving party]."  Fed. R. Civ. P. 50(a).  The standard is the same whether the motion is made before the case is submitted to the jury or renewed after the jury's verdict.  *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 723–24 (11th Cir. 2012).

Our sole consideration is whether the evidence sufficiently supports the verdict.  *Chaney v. City of Orlando*, 483 F.3d 1221, 1227 (11th Cir. 2007).  We must evaluate all the evidence and draw all logical inferences in favor of the nonmoving party.  *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016).  It is for the jury—not for us or the district court—"to weigh conflicting evidence and inferences, and determine the credibility of witnesses."

26

*Id.* Thus, "we examine the entire record in the light most favorable to . . . the party that prevailed at trial, and ask whether the evidence nonetheless points 'so overwhelmingly in favor of' [the moving party] that the jury's verdict cannot stand." *Royal Palm Props.,* 950 F.3d at 782 (quoting *Richardson v. Leeds Police Dep't*, 71 F.3d 801, 805 (11th Cir. 1995)).  While "the non-movant must put forth more than a mere scintilla of evidence suggesting that reasonable minds could reach differing verdicts," *Thorne v. All Restoration Servs., Inc.*, 448 F.3d 1264, 1266 (11th Cir. 2006), a jury's verdict "will not be overturned unless no rational trier of fact could have reached the same conclusion based upon the evidence in the record," *Nat'l Fire Ins. Co. of Hartford v. Fortune Const. Co.*, 320 F.3d 1260, 1267 (11th Cir. 2003).

For Plaintiffs to prevail on their TVPA claims, the evidence must support two things.  First, the record must contain sufficient evidence that each decedent's death was an extrajudicial killing.  Second, the evidence must link Defendants to that killing based on a theory of liability, such as the command-responsibility doctrine, aiding and abetting, or conspiracy liability.  *See Mamani I*, 654 F.3d at 1154 ("[B]efore we decide who can be held responsible for a tort, we must look to see if [a] tort has been pleaded at all.").  The District Court held that Plaintiffs had not presented a legally sufficient evidentiary basis on which a reasonable jury could find for them on the first prong—that is, the evidence, taken in a light most

27

favorable to Plaintiffs, was so overwhelming that the deaths were not extrajudicial killings that no reasonable jury could conclude otherwise. After outlining the District Court's decision, we explain why we disagree.

### A.

Defendants' central argument before the District Court was that because Plaintiffs had not introduced any evidence regarding the identity of the individual shooters who killed the decedents nor evidence about the shooters' states of mind, Plaintiffs needed evidence of Defendants' alleged preconceived plan to kill civilians for a reasonable jury to conclude that the killings were deliberated. The District Court determined that Plaintiffs had not presented any evidence that such a plan existed and therefore granted judgment as a matter of law to Defendants.[12]

In ruling on Defendants' renewed Rule 50 motion, the District Court outlined the case's history. The District Court noted that a key difference between the allegations of the amended complaint (which we rejected as lacking sufficient factual allegations to state an ATS claim against Defendants in *Mamani I*) and Plaintiffs' second amended complaint was the "allegation that Defendants entered office with a preconceived plan to deliberately kill civilians in order to suppress

---

[12] Defendants also argued that the jury's verdict is irreconcilably inconsistent. The District Court held that the jury's verdict is not irreconcilably inconsistent, and an inconsistent verdict is not an independent basis to grant Defendants' Rule 50 motion. Defendants do not challenge this ruling on appeal. And we agree that, even if the verdict is inconsistent, it would not be a reason to grant a Rule 50 motion. *See Connelly v. Metro. Atlanta Rapid Transit Auth.*, 764 F.3d 1358, 1364 (11th Cir. 2014).

opposition to their economic policies." The District Court explained that it had

denied Defendants' motion to dismiss the TVPA claims (a ruling that we declined

to review in *Mamani II*) based on this new allegation.

The District Court further explained that it had denied Defendants' motion

for summary judgment for the same reason. At the summary-judgment stage, the

Court had identified five pieces of evidence that could support a reasonable

inference that the deaths were due to the existence and implementation of

Defendants' plan:

> (1) changes in Bolivian military doctrine during Defendant Lozada's
> administration to define protesters as subversives who could be targeted
> with military force; (2) a pattern of soldiers being ordered to shoot
> unarmed civilians in multiple different locations, including each
> location where decedents were killed, on multiple different dates; (3) a
> pattern of soldiers shooting indiscriminately at civilians at times when
> witnesses saw no armed protesters or anything indicating that the
> soldiers were firing defensively; (4) Defendants' repeated refusal to
> seriously commit to achieving peaceful, negotiated solutions to
> protests; and (5) consistent with Defendants' plan, the utilization of
> troops from Eastern Bolivia.

The District Court then evaluated the evidence presented at trial and

concluded that while Plaintiffs had presented evidence in all five categories that a

plan was implemented, they had failed to present "any evidence that such a plan

actually *existed*." The Court concluded that the only witness who could

supposedly testify about the existence of a plan did not offer any testimony that

29

Lozada agreed to a plan to kill civilians.  Absent evidence of a plan, the Court

concluded that there was not a sufficient evidentiary basis for the TVPA claims.

The Court noted that although Plaintiffs had presented evidence of

indiscriminate shootings by Bolivian soldiers, there was also evidence that there

were specific crises in each location.[13]  Those crises established "a

plausible reason for the military's presence and its use of some degree of force in

each shooting location."  The evidence, therefore, did not provide a basis to infer

(rather than speculate) that the shootings were "more than disproportionate

reactions to civil unrest or attacks of the military, but were essentially

premeditated, or deliberated, killings."  Evidence regarding the number of civilian

deaths was also insufficient to infer that any death was necessarily deliberate.

Evidence of those deaths was as consistent with the need to restore order to Bolivia

as it was to use military force to kill unarmed civilians.  The District Court also

determined that evidence that leaders were warned of the possibility of civilian

deaths and continued to use military force did not show an *intent* to *cause* civilian

casualties.  Therefore, because Plaintiffs had failed to present evidence that the

---

[13] The District Court listed these as:
   (1) an ambush in Warisata on the military convoy transporting trapped travelers on September 20;
   (2) crippling blockades in El Alto and La Paz in October;
   (3) attacks on October 12 in El Alto on tanker trucks transporting gasoline to La Paz by protestors armed with rifles and dynamite; and
   (4) an attack on the military on October 13 in the Southern Zone of La Paz.

30

decedents' deaths were "undertaken with studied consideration and purpose," the District Court granted judgment as a matter of law to Defendants. Because the District Court determined that the deaths were not deliberated killings, it did not address whether there was sufficient evidence to support command-responsibility liability.

### B.

We reverse the District Court's ruling. We hold that Plaintiffs did not need to present evidence of a premeditated plan to kill civilians to prevail on the first prong of their TVPA claims. While evidence of such a plan could help support *both* that the killings were deliberate and that Defendants were involved in the wrongdoing, the lack of evidence about a plan is not fatal to Plaintiffs' claims if there is sufficient evidence for a reasonable jury to conclude that each victim's death was "undertaken with studied consideration and purpose" and that Defendants were tied to the wrongdoing. We first assess what kind of evidence could support that the decedents' deaths were extrajudicial killings and then analyze what evidence Plaintiffs put forth at trial.

### 1.

As we have previously explained, what constitutes an extrajudicial killing under the TVPA is not always clear. *Mamani I*, 654 F.3d at 1155 n.9. The TVPA contains a two-sentence definition. An extrajudicial killing is

31

a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1991) (codified at 28 U.S.C. § 1350 note).  The parties stipulated that none of the killings were "authorized by a regularly constituted court."  Therefore, we assess what kind of evidence would allow a reasonable jury to conclude that the deaths (a) were "deliberated" and (b) were killings that, under international law, were not lawfully carried out under the authority of a foreign nation.

a.

The minimal requirement for an extrajudicial killing is that the killing must be "deliberate," which we have defined as being "undertaken with studied consideration and purpose."  *Mamani I,* 654 F.3d at 1155.  As we explained in the context of Plaintiffs' ATS claims, an extrajudicial killing is different than an "accidental or negligent shooting," a killing based on "individual motivations (personal reasons)," or "precipitate shootings during an ongoing civil uprising." *Id.*

Some killings are clearly "deliberate" in the sense that they are cold-blooded, calculated, premeditated schemes designed to cause certain death.  The 1998 embassy bombings in Kenya and Tanzania at issue in *Owens v. Republic of*

32

*Sudan*, 864 F.3d 751, 770 (D.C. Cir. 2017), *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020), provide one example. The D.C. Circuit determined that the bombings in *Owens* were deliberate because they "involved substantial preparation, meticulous timing, and coordination across multiple countries in the region." *Id.* (citing *Mamani I*, 654 F.3d at 1155). Likewise, targeted acts intended to kill a particular person are deliberate. For example, in *Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005), we upheld the jury's verdict on a TVPA claim where there was evidence that a political prisoner was specifically targeted for execution. Cabello's family had evidence that the defendant selected and reviewed his prisoner file before ordering the death squad to shoot him. *Id.*; *see also Mamani I*, 654 F.3d at 1155.

But the definition of extrajudicial killing in the TVPA is not limited to coordinated attacks and targeted executions. It is a broad phrase meant to encompass many types of purposeful killing.

We start with the text of the TVPA. Deliberate means "undertaken with studied consideration and purpose." *Mamani I*, 654 F.3d at 1155. "Killing" simply means "[t]he act of causing the end of an animate thing's life." *Killing*, Black's Law Dictionary (11th ed. 2019). Therefore, the statute requires, at a minimum, that there be a considered, purposeful act that takes another's life.

A comparison of the TVPA's text to other language lends further support that the definition encompasses a broad range of conduct.  The definition of an extrajudicial killing in the TVPA draws on the language of Article 3 of the Geneva Conventions of 1949.[14]  Article 3 of the Geneva Convention prohibits "the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples."  The key difference is that the TVPA substitutes "a deliberated killing" for "the passing of sentences and the carrying out of executions."  Dictionaries define execution as the "carrying out of a death sentence," *Execution*, Black's Law Dictionary (11th ed. 2019), and "putting to death as a legal penalty," *Execution*, Webster's Third New International Dictionary (1993).  Killing, on the other hand, is "so broad that it suggests nothing about the agency, the means of death, or the surrounding circumstances."  Bryan A. Garner, Garner's Dictionary of Legal Usage (3d. ed. 2011).  In the TVPA, Congress replaced the specific phrase "the passing of sentences and the carrying out of executions" with the broader phrase "deliberated killing."  This difference

---

[14] The two provisions share twenty-one words in common.  The legislative history also confirms what a comparison of the text would suggest.  "[T]he concept of 'extrajudicial killings' is derived from article 3."  H.R. Rep. No. 102-367, at 5, *as reprinted in* 1992 U.S.C.C.A.N. 84, 87; *see also* S. Rep. No. 102-249, at 6 ("This definition conforms with that found in the Geneva Convention for the Amelioration of the Wounded and Sick in Armed Forces in the Field (1949).").

34

"signals [that] Congress intended the TVPA to reach a broader range of conduct." *Owens*, 864 F.3d at 772.

And our sister circuits agree, recognizing that the phrase deliberated killing includes many types of purposeful killing. *See, e.g.*, *Owens*, 864 F.3d at 773 (describing "deliberated killing" as a "more expansive prohibition"). For example, the D.C. Circuit has held that maltreatment resulting in death constitutes a deliberate killing. In *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1050 (D.C. Cir. 2014), the plaintiff submitted expert statements that the victim likely died due to starvation while being held captive by North Korean operatives. In particular, the "torture and malnutrition" that was deliberately inflicted on him caused his "untimely death." *Id.* The Court held that the plaintiff had produced evidence "satisfactory to the court" to sustain a default judgment for an extrajudicial killing under the Foreign Sovereign Immunities Act.[15]  *Id.*

In comparison, when there is insufficient evidence to conclude that actions by state agents caused the death or where the death is consistent with natural causes, there is no "deliberated killing." For example, in *Sullivan v. Republic of Cuba*, 891 F.3d 6, 12 (1st Cir. 2018), the First Circuit determined that the plaintiff

---

[15] State sponsors of terrorism can be sued in federal court for torture and extrajudicial killing under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"). 28 U.S.C. § 1605A; *Han Kim*, 774 F.3d at 1045. The meaning of "extrajudicial killing" under the FSIA is defined by reference to the TVPA. 28 U.S.C. § 1605A(h)(7) ("[T]he terms 'torture' and 'extrajudicial killing' have the meaning given those terms in section 3 of the Torture Victim Protection Act of 1991.").

lacked evidence that the Cuban government deliberately killed her father after he had allegedly been incarcerated for twenty years. The plaintiff presented no evidence regarding the conditions in which her father was held. *Id.* The district court had found that evidence of the plaintiff's father's burns was consistent with the injuries he had sustained in a plane crash that occurred before he was held captive and there was no evidence that his injuries were ignored or not properly treated. *Sullivan v. Republic of Cuba*, 289 F. Supp. 3d 231, 245 & n.16 (D. Me. 2017), *aff'd*, 891 F.3d at 12.

Furthermore, an extrajudicial killing can be deliberate even if the state-actor is not targeting a particular individual. One need not intend that a specific person die to deliberately kill under the TVPA. As one court has said, "the statutory definition does not contain a precision-targeting element." *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 263 (D.D.C. 2016), *aff'd*, 864 F.3d at 751 (D.C. Cir. 2017), *vacated and remanded sub nom. Opati*, 140 S. Ct. at 1601. Engaging in an act, such as shooting, with the "goal and expectation of killing" another is deliberation even if the actor could not produce a list of names who would perish or "look their victims in the eye." *Id.*; *see also Shoham v. Islamic Republic of Iran*, No. 12-CV-508 (RCL), 2017 WL 2399454, at *12 (D.D.C. June 1, 2017) (concluding that a rock deliberately thrown at the windshield of a car, targeted because it had a yellow license plate, was "undoubtedly an 'extrajudicial killing'").

36

Finally, we can reference domestic law to interpret the TVPA and claims brought thereunder. *Drummond*, 782 F.3d at 606. Under principles of domestic law, a deliberate killing is generally done in the absence of "sudden passion" or without "lawful or just provocation." *See, e.g.*, 40 C.J.S. Homicide § 84 (2020) (collecting cases). While deliberation requires some period of reflection, it is not necessary that a person "shall have brooded over [a] plan to kill or entertained it for any considerable period of time." *Gov't of Virgin Islands v. Lake*, 362 F.2d 770, 776 (3d Cir. 1966). Deliberated killing simply means a killing "undertaken with careful consideration, not on a sudden impulse." *Owens*, 174 F. Supp. 3d at 263 (citing *State v. Hamlet*, 312 N.C. 162, 321 S.E.2d 837, 842–43 (1984) and *People v. Dykhouse*, 418 Mich. 488, 345 N.W.2d 150, 154 (1984)).

Therefore, we hold that, to demonstrate a "deliberated killing" here, Plaintiffs must present some evidence that their relatives' deaths were the result of a purposeful act to take another's life and that the deaths were not caused by "accidental or negligent" behavior or other external circumstances and were not a result of just provocation or sudden passion. Viewing the evidence and drawing all inferences in the light most favorable to Plaintiffs, we determine that a rational trier of fact could conclude that these deaths were deliberated killings. The evidence is not so overwhelming in favor of Defendants that the jury's verdict cannot stand.

For each decedent, Plaintiffs presented evidence that the cause of death was consistent with a deliberate shot from a member of the Bolivian military in the absence of just provocation. Or to use Plaintiffs' words, a jury could reasonably infer that "these soldiers deliberately fired deadly shots with measured awareness that they would mortally wound civilians who posed no risk of danger." None of the decedents were armed, nor was there evidence that they posed a threat to the soldiers. Many were shot while they were inside a home or in a building. Others were shot while they were hiding or fleeing. There is little to no evidence that members of the Bolivian military were in imminent danger or acted out of sudden passion when they fired. Witnesses testified that they saw the armed members of the military, that there were not armed civilians in the area, and that the military aimed at or targeted each individual decedent or other civilians around the time of the incidents.

Marlene, for example, was shot while she was inside her home. Her mother testified that she saw armed soldiers running away after her daughter was shot. Marlene's father testified that he did not see any civilians shooting at the military that day. Aquilar testified that officers in his squadron were aiming for civilians and that he did not see any armed civilians. A reasonable jury could conclude that a member of the Bolivian military engaged in a purposeful act to take Marlene's life.

Castaño testified that the bullet that struck Lucio came from either the five officers on the ground, who were aiming at civilians, or the military helicopter circling Senkata. He also testified that he did not see any armed protestors and that he did not see any civilians provoke the military. Based on his testimony, a jury could reasonably infer that Lucio's death was not an accident or the result of a negligent firing.

Roxana was shot on the roof of her cousin's house. Her brother testified that he saw military vehicles on the avenue before Roxana was shot and that he did not see any civilians with weapons. Marcelino was shot through a window; his widow testified that she saw armed soldiers on trucks positioning to shoot. Likewise, Teodosia's niece testified that the armed soldiers aimed at them when they looked out the window and aimed at her mother when she went to the door. Teodosia was shot while praying next to the window. Three other witnesses in the Río Seco region testified that they did not see armed civilians in that area on October 12, 2003. Ortega also testified that she heard officers give soldiers orders "to shoot at the civilians" and that other soldiers said they were being "forc[ed]" to hurt civilians. Those testimonies provide sufficient evidence that a jury could reasonably conclude that Roxana, Marcelino, and Teodosia were deliberately killed by members of the Bolivian military.

39

Gonzalez witnessed members of the Bolivian military shoot Arturo, Jacinto, and two other men.  He testified that the soldiers positioned themselves to fire at civilians and "were shooting everywhere."  "[E]very time the straw would move, [the soldiers] would fire."  A Bolivian soldier, Flores Limachi, also testified that, after a fellow soldier was killed, his unit was acting under orders to shoot at the civilians in the hills with lethal ammunition.  He testified that he never saw civilians shooting at the soldiers nor did he see any civilians with firearms.[16]  A reasonable jury could find that Arturo and Jacinto were deliberately killed.

Pari testified that he saw soldiers on the bridge who shot at Raúl; he also testified that he did not see armed civilians in Ovejuyo that day.  Flores Limachi also testified that he saw soldiers shooting at civilians in Ovejuyo.  That evidence is consistent with purposeful acts by Bolivian soldiers to take civilian lives.

We conclude that there is sufficient evidence, taken in the light most favorable to Plaintiffs, that a reasonable jury could conclude that each death was a "deliberated killing."[17]  While the evidence for deliberation is strongest for the deaths where an eyewitness actually saw the shot, Plaintiffs put forth sufficient—

---

[16] We take Flores Limachi's testimony in the light most favorable to Plaintiffs.  It is for the jury to consider the conflicting police report as impeachment evidence and "determine the credibility of witnesses."  *McGinnis*, 817 F.3d at 1254.

[17] There is no evidence in the record that the decedents' deaths were caused by soldiers acting on individual motivations, much less overwhelming evidence, taken in the light most favorable to Plaintiffs, that the killings were personal in nature.  Even if there was such evidence, the trial testimony indicates that each death was a "deliberated killing," in the sense of being a considered, purposeful act to take another's life.

even if not overwhelming—evidence from which a rational trier of fact could conclude that each decedent was deliberately killed, which is all that is required. *Royal Palm Props.*, 950 F.3d at 782; *Thorne*, 448 F.3d at 1266; *Nat'l Fire Ins. Co. of Hartford*, 320 F.3d at 1267.  Given that there is not "overwhelming" evidence that these decedents posed a threat to the Bolivian soldiers nor is there "overwhelming" evidence that the soldiers and officers who shot at the victims were acting on sudden impulse, Defendants' alternative explanation for the shots does not compel us to conclude that no reasonable jury could find that these were deliberated killings.  *See Royal Palm Props.*, 950 F.3d at 782.  As we explain below, the evidence suggesting that there were specific crises in each general location goes to whether the killings were extrajudicial, rather than to whether they were deliberated.

b.

Determining that Plaintiffs' relatives were deliberately killed is not the end of the story.  As the text makes clear, "not all deliberated killings are extrajudicial killings." *Mamani I*, 654 F.3d at 1155.  The second sentence cautions that the term "extrajudicial killing" "does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation."  Pub. L. No.

41

102-256, § 3(a).[18]  So, a killing can be *deliberate*, but if, under international law, it is "lawfully carried out under the authority of a foreign nation," it would not be deemed an *extrajudicial* killing.

To determine whether these deliberated killings are extrajudicial, we must, per the terms of the text, look to international law.[19]  *See Drummond*, 782 F.3d at 606 ("[O]n the rare occasions when we do look to general principles of international law for guidance as to what a theory of liability or statutory definition requires, we do so only because the TVPA itself implicitly or explicitly incorporated those principles from international law.").  Customary international law is "by its nature, difficult to determine," because it "does not stem from any single, definitive, readily-identifiable source."  *United States v. Bellaizac-Hurtado*,

---

[18] And "although we need not rely on legislative history given the text's clarity, we note that the history only supports our interpretation."  *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 459, 132 S. Ct. 1702, 1710 (2012); *see also Drummond*, 782 F.3d at 606.  The House Report prepared contemporaneously with the passage of the TVPA indicates that "deliberated killing" is a broad concept, meant to capture even "killings that lack the requisite extrajudicial intent."  H.R. Rep. No. 102-367, at 4.  The House Report states that killings "caused by a police officer's authorized use of deadly force" are captured in the meaning of "deliberated."  *Id.*  Such killings are the result of a purposeful act to take another's life and thus are *deliberate*, even if not necessarily "extrajudicial."

[19] Again, legislative history, as documented in the Senate and House Reports, confirms that the definition of "extrajudicial killing" comports with the meaning found in customary international law.  S. Rep. No. 102-249, at 6 ("The TVPA incorporates into U.S. law the definition of extrajudicial killing found in customary international law."); H.R. Rep. No. 102-367, at 4 ("It defines 'torture' and 'extrajudicial killing' in accordance with international standards.").  The Senate Report continues that the definition of "extrajudicial killings" excludes "killings that are lawful under international law-such as killings by armed forces during declared wars which do not violate the Geneva Convention and killings necessary to effect a lawful arrest or prevent the escape of a person lawfully detained."  S. Rep. No. 102-249, at 6.

700 F.3d 1245, 1253 (11th Cir. 2012) (quoting *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 248 (2d Cir. 2003)).  However, we look to "the works of jurists and commentators who by years of labor, research, and experience have made themselves peculiarly well acquainted with the subjects of which they treat."  *Id.* at 1252 (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 734, 124 S. Ct. 2739, 2767 (2004)).  To qualify as customary international law, the practice must "reflect wide acceptance among the states particularly involved in the relevant activity" and "there must be a sense of legal obligation."  *Id.* (quoting *Buell v. Mitchell*, 274 F.3d 337, 372 (6th Cir. 2001)).

Customary international law recognizes the right to life, and the corollary right to be free from the arbitrary deprivation of it, as a bedrock principle.[20]  The right to life has been characterized as "the supreme human right, since without effective guarantee of this right, all other rights of the human being would be devoid of meaning."  Manfred Nowak, U.N. Covenant on Civil and Political Rights: CCPR Commentary 121 (2d ed. 2005) (footnote omitted).  International

---

[20] We do not mean to say that "deliberated killing" and "arbitrary deprivation of life" are necessarily synonymous.  *See, e.g.*, Nowak, CCPR Commentary 127 n.37 (describing the criticism of "arbitrary" and concluding that although intention may not be a necessary condition for arbitrariness, "[i]n practice, the Committee has held the issue of whether deprivation of life was intentional to be relevant for the determination of a violation of Art. 6").  We use international standards and cases to demonstrate only that "extrajudicial killing" in customary international law encompasses indiscriminate shootings by soldiers without justifiable provocation and can be considered a "deliberated killing" if the circumstances indicate that the deaths are neither "accidental or negligent."  *See Mamani I*, 654 F.3d at 1155.

law also generally recognizes the use of proportionate force as lawful. *Id.* at 129 ("[T]he term 'arbitrarily' aims at the specific circumstances of an individual case and their reasonableness (proportionality), making it difficult to comprehend in *abstracto*."). Thus, the use of military force (and the resulting precipitate shootings) during an ongoing civil uprising may be lawful if the circumstances support such action.

International tribunals have frequently held that "indiscriminate firing" against unarmed persons violates the right to be free from the arbitrary deprivation of life, and thus is unlawful. For example, the United Nations Human Rights Committee determined that Paraguay violated Article 6 of the International Covenant on Civil and Political Rights[21] when police and military forces used extreme force to clear blockades of roadways by agricultural and union workers. *See* Human Rights Committee, *Florentino Olmedo v. Paraguay*, Commc'n No. 1828/2008, U.N. Doc. CCPR/C/104/D/1828/2008 (Apr. 26, 2012). Police in Paraguay used "tear gas, firearms, and water cannons" to disperse the protestors, as well as violently beat demonstrators and "fired indiscriminately at those who were fleeing" with live ammunition. *Id.* ¶¶ 2.5–2.6. The Committee concluded that Paraguay had an obligation "to prevent arbitrary killing by their own security

---

[21] "Every human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of his life." International Covenant on Civil and Political Rights, art. 6, § 1, Dec. 16, 1966, 999 U.N.T.S. 171.

forces" as well as provide a thorough investigation and prosecution.  *Id.* ¶ 7.3.  The Committee likewise found that Kyrgyzstan had violated Article 6 after a citizen was shot and killed by the "militia opening fire on demonstrators in an attempt to disperse the crowd."  Human Rights Committee, *Umetaliev v. Kyrgyzstan*, Commc'n No. 1275/2004 ¶ 2.2, U.N. CCPR/C/94/D/1275/2004 (Oct. 30, 2008).

The European Convention for the Protection of Human Rights and Fundamental Freedoms, which is specifically referenced in the Senate Report,[22] provides that "[n]o one shall be deprived of his life intentionally save in the execution of a sentence of a court following his conviction of a crime for which this penalty is provided by law."  Art. 2, § 1, 1950, 213 U.N.T.S. 221.  The Convention recognizes that some deprivations of life are not in violation of that provision, such as when the death results from "force which is no more than absolutely necessary" "in defence of any person from unlawful violence," "to effect a lawful arrest or to prevent escape of a person lawfully detained," or "in action lawfully taken for the purpose of quelling a riot or insurrection."[23]  *Id.* art. 2, §§ 1 & 2.

The European Court of Human Rights has found that the use of lethal force against demonstrators violates Article 2 of the European Convention, even when

---

[22] S. Rep. No. 102-249, at 6 nn.8 & 9.
[23] Article 15, § 2 also "exclude[s] 'deaths resulting from lawful acts of war' from the prohibition against extrajudicial killings."  S. Rep. No. 102-249, at 6 n.9.

45

those demonstrations are admittedly "far from peaceful." Eur. Ct. H.R., *Güleç v. Turkey*, App. No. 54/1997/838/1044 (July 27, 1998). In *Güleç*, the Court determined that Turkey used more force than was necessary when armored vehicles "opened fire in the main street, where the demonstration was taking place, either in the air or at the ground" after the demonstrators attacked the security forces with sticks, stones, and firearms. *Id.* ¶¶ 68, 73. Although the investigative Commission concluded that the machine gun was not "used to kill demonstrators intentionally," and the demonstration could be deemed a riot, the Court held that "a balance must be struck between the aim pursued and the means employed to achieve it." *Id.* ¶ 71. Similarly, the Court concluded that Turkey again violated Article 2 when security forces responded to two other demonstrations by shooting indiscriminately into the crowd. Eur. Ct. H.R., *Case of Şimşek v. Turkey*, App. No. 35072/97 and App. No. 37194/97 (July 26, 2005). The Court characterized the protests in Gazi and Ümraniye as "not peaceful;" demonstrators were throwing stones and fire bombs at the police barricades and were causing damage to nearby buildings. *Id.* ¶ 107. Nevertheless, the force used to dispel the demonstrators was not justified because the "officers shot directly at the demonstrators without first having recourse to less life-threatening methods." *Id.* ¶¶ 108, 113.

Other international tribunals and conventions are in accord. The Inter-American Court concluded that suppression operations in Venezuela that killed

276 people, where "most of the deaths were due to indiscriminate firing by agents of the Venezuelan State, while others resulted from extrajudicial executions" violated Article IV (the right to life) of the American Convention of Human Rights. *Caracazo v. Venezuela*, Inter-Am. Ct. H.R. No. 58, ¶ 2(k) (Nov. 11, 1999). Like the Bolivian decedents, many of the Venezuelan victims were killed in their homes. *Id.* ¶ 2(l). The U.N. Manual on the Effective Prevention and Investigation of Extra-Legal, Arbitrary and Summary Executions includes within the scope of its mandate "deaths resulting from the excessive use of force by law-enforcement personnel." U.N. Doc. E/ST/CSDHA/12 (1991). The U.N. Special Rapporteur, which was established to examine all situations of extrajudicial, summary, or arbitrary executions has recommended that "all orders to 'shoot on sight' must only be given as a measure of very last resort to protect lives" and that governments should withdraw all general orders to shoot on sight. United Nations Comm'n on Human Rights, Extrajudicial, Summary or Arbitrary Executions, Report of the Special Rapporteur, E/CN.4/2004/7 (Dec. 2003); *see also* Int'l Comm'n of Jurists, Enforced Disappearance and Extrajudicial Execution: The Rights of Family Members, A Practitioners' Guide, No. 10, at 30 (July 2016).

2.

Armed with an understanding of "extrajudicial killing" as a broad prohibition, encompassing considered, purposeful acts that take another's life in

47

the absence of a sudden passion or just provocation, we hold that evidence that the decedents were killed by soldiers acting under orders to shoot or kill civilians and evidence that Defendants were connected to those orders provides a legally sufficient basis for a TVPA claim. Plaintiffs need not present evidence of the existence of a preconceived, meticulously coordinated plan, campaign, or strategy to kill civilians to demonstrate that the victims were deliberately killed. The District Court's reasoning, and requirement of such evidence, conflates the standard for a deliberated killing with the theory of indirect liability that holds Defendants liable for the wrongdoing. For Plaintiffs to prevail on their TVPA claims based on a theory of command-responsibility liability, Plaintiffs do not need evidence that the superiors acted with deliberation. Requiring evidence of a plan or other grand strategy inappropriately superimposes a deliberation requirement on the theory of indirect liability. Instead, Plaintiffs need only establish that there was an extrajudicial killing and then connect Defendants to that wrongdoing.[24]

We agree with the District Court that Plaintiffs lacked compelling evidence of a preconceived plan by Lozada and Berzaín to kill civilians in order to quell opposition to their economic policies. But that was not the only theory that Plaintiffs advanced; they also claimed that their relatives were killed by soldiers

---

[24] Such a connection could be demonstrated via evidence that Defendants (1) had a superior-subordinate relationship with the wrongdoer, (2) knew or should have known of the wrongdoing, and (3) failed to prevent or punish the wrongdoing. *Mamani II*, 825 F.3d at 1312.

48

acting under orders to indiscriminately shoot at civilians and that Defendants were either personally involved in those orders or otherwise failed to prevent or punish such conduct within their chain of command.[25]  The District Court did not consider evidence in support of that theory when ruling on Defendants' renewed motion for judgment as a matter of law.

We agree with the District Court that Plaintiffs' evidence about widespread casualties and a pattern of innocent deaths does not suffice to demonstrate that in any particular instance a death was an extrajudicial killing, as the same evidence is consistent with military reaction to just provocation, which is lawful under international law.  On the other hand, evidence indicating that the decedents were killed by soldiers indiscriminately shooting or using force against civilians in the absence of just provocation would support a conclusion that the deaths were extrajudicial killings.  Plaintiffs produced some eyewitness testimony about the lack of armed civilians in each area and some evidence that soldiers targeted or aimed at civilians.  Defendants presented evidence that there were specific crises in each location, including evidence of military fatalities in some areas.  We remand

---

[25] As the District Court noted, the second amended complaint included, for the first time, numerous allegations about Defendants' "preconceived plan" to kill civilians to implement their economic policies.  In addition, the second amended complaint, unlike the complaint in *Mamani I*, included allegations that soldiers acted under *orders* to kill civilians and specific allegations that Defendants were involved in those orders or otherwise failed to act to prevent or punish that conduct.  Plaintiffs also argued this theory of the case at the summary-judgment stage, at trial, in opposition to Defendants' Rule 50 motion, and on appeal.

for the District Court to consider in the first instance whether, for each decedent, Plaintiffs produced sufficient evidence to demonstrate that each death was not lawful under international law and thus extrajudicial and, if so, whether Plaintiffs produced sufficient evidence to link Defendants to that wrongdoing via the command-responsibility doctrine.[26]

IV.

In addition to the TVPA claims, Plaintiffs asserted claims for intentional wrongful death based on Bolivian law. The jury returned a verdict for Defendants, finding that the decedents' deaths were not willful and intentional killings by a Bolivian soldier. On appeal, Plaintiffs argue that the District Court abused its discretion (1) by admitting State Department cables that reported on the situation in Bolivia in October 2003, and (2) by refusing to give Plaintiffs' requested jury instruction regarding intent. We address each argument in turn.

A.

---

[26] Defendants argue on appeal that we can affirm on any basis in the record, including on grounds that the District Court did not consider, and that we should uphold the District Court's judgment as matter of law by holding that there was insufficient evidence to support the jury's verdict that Defendants were liable under the command-responsibility doctrine. "It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 609 (11th Cir. 1991) (quoting *Singleton v. Wulff*, 428 U.S. 106, 120, 96 S. Ct. 2868, 2877 (1976)). Given the extent of the record below, and the comparatively minor attention that this issue had in appellate briefing, we exercise our discretion not to address this question in the first instance. *See id.* The same considerations compel us to remand the case for a determination of whether the deliberated killings were committed in contravention of international law.

In closing argument, Defendants claimed that "the most important piece[s] of evidence in this case" were seven State Department cables about the status of the Bolivian social unrest in October 2003. At trial and again on appeal, Plaintiffs argue that the cables should have been excluded because they contain "highly prejudicial second-level hearsay." Defendants now contend that the cables are admissible under the public-records exception to the rule against hearsay and that if the District Court erred in admitting the cables, it was harmless because the cables were duplicative of other evidence in the record. We review evidentiary rulings for an abuse of discretion; "[h]owever, basing an evidentiary ruling on an erroneous view of the law constitutes an abuse of discretion per se." *United States v. Henderson*, 409 F.3d 1293, 1297 (11th Cir. 2005).

1.

The Federal Rules of Evidence generally bar the admission of hearsay, which are out-of-court statements offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c); 802. The public-records exception provides that "[a] record or statement of a public office" is not excluded by the rule against hearsay if the evidence sets out "a matter observed while under a legal duty to report" or if it contains "factual findings from a legally authorized investigation." *Id.* 803(8). Under either formulation, the evidence is only admissible if "the opponent does not

show that the source of information or other circumstances indicate a lack of trustworthiness." *Id.*

In *United Technologies Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009), we held that a District Court did not abuse its discretion in excluding third-party statements in a report prepared by the Office of the Inspector General of the United States. We held that for the public-records exception to apply, the report "must contain 'factual findings' that are 'based upon the knowledge or observations of the preparer of the report,' as opposed to a mere collection of statements from a witness." *Id.* (quoting *Miller v. Field*, 35 F.3d 1088, 1091 (6th Cir. 1994)).[27] Collecting cases from other circuits, we elaborated that entries must result from the preparer's "own observations and knowledge," and that "statements made by third persons under no business duty to report" are not admissible. *Id.* (quoting *United States v. Pazsint*, 703 F.2d 420, 424 (9th Cir. 1983)); *see also United States v. Cent. Gulf Lines, Inc.*, 747 F.2d 315, 319 (5th Cir. 1984) ("[T]he record sought to be admitted must be made from matters within the personal knowledge of the public official making the record or his agent or someone with a duty to report the matter to a public official.").

---

[27] In *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170, 109 S. Ct. 439, 450 (1988), the Supreme Court concluded that opinions and conclusions based on factual findings are also admissible under Rule 803(8)(C). "As long as the conclusion is based on a factual investigation and satisfies the Rule's trustworthiness requirement, it should be admissible along with other portions of the report." *Id.*

52

We have also held that statements can be hearsay "even though they do not explicitly paraphrase the words of others, [because] the only conceivable explanation for how [the witness] discovered this information is through listening to the statements of others." *United States v. Ransfer*, 749 F.3d 914, 925 (11th Cir. 2014) (alterations in original) (quoting *United States v. Baker*, 432 F.3d 1189, 1206 (11th Cir. 2005)). And "a reporter's account of what eyewitnesses reported" is "double hearsay forbidden by Rule 805." *Baker*, 432 F.3d at 1211 n.23.

2.

At the summary-judgment stage, the District Court deemed the cables inadmissible, reasoning that the reports were "based not on the preparer's personal observations, but on the statements of others." The District Court noted that one cable did not appear to relay what an embassy official observed on the ground, but "simply report[s] the Bolivian military's position—that the military convoy was ambushed." Additionally, many of the cables included the information derived from media reports, "which are obviously themselves hearsay." The Court left open the possibility that some portions of the cables, most notably information about the "impact on La Paz of the October 2003 protests," may fall under the public-records exception, but it deemed those portions immaterial to its analysis and duplicative of other evidence. In assessing whether the cables were admissible under the residual exception in Rule 807(a)(3), the Court found that the cables had

53

sufficient guarantees of trustworthiness because the cables were "signed by the then-U.S. Ambassador to Bolivia" and the "State Department had no incentive to do anything but report the situation in Bolivia fairly and accurately."

At trial, Defendants sought to admit cables relating to the events in October 2003, contending that the information was reliable as the U.S. Embassy is in La Paz. Plaintiffs objected (1) that the cables do not indicate "who was [there], who saw violence, [or] whose opinions it is that violence surged;" (2) that the cables "detail events throughout the entire country of Bolivia, not simply La Paz;" (3) that they contain "speculation, hearsay, [and] unidentified reports;" and (4) that "defendants have made no indication which parts of [the cables] are based on personal knowledge."

In response, Defendants argued that the cables are signed by State Department officials, contain information from La Paz and El Alto (areas with State Department presence), and contain factual information such as the airport has been closed and clashes with protestors resulted in deaths. The District Court, without further discussion, admitted the cables into evidence.[28]

---

[28] Plaintiffs again objected to the admission of the State Department cables the following day based on their trustworthiness and Rule 403. The District Court ruled that the cables were sufficiently trustworthy (because the State Department did not have an adversarial motive to misreport the situation in Bolivia) and that Plaintiffs did not meet their burden of demonstrating that the probative value of the cables was substantially outweighed by the danger of unfair prejudice. Because we determine that the cables contain hearsay, we take no position on the District Court's conclusion that the "State Department had no incentive to do anything but report the situation in Bolivia fairly and accurately." We do, however, note that one cable indicated

3.

We conclude that the District Court abused its discretion in admitting the cables because it applied the wrong legal standard. The cables are relevant only to establish the truth of their contents—to report on specific incidents of violence and occurrences around Bolivia. Most of the information that buttresses the State Department's findings about the events in Bolivia lacks source attribution. It is impossible for us to determine whether the information was gleaned from on-the-ground observations by State Department officials (or other agents under a duty to report), was a conclusion drawn by State Department officials based on an investigation, or is just a collection of statements made by third parties. As Plaintiffs point out, there is no indication who was there or who drew the conclusions within the reports.

The cables repeatedly base their findings on unidentified "reports" or "sources." In other places, the cables directly quote statements made by political figures. One cable describes an opinion poll, one cable repeats "unconfirmed rumors," and one cable lists the four themes observed by "influential Bolivian media leaders." Absent additional information on how the State Department

that the State Department was "publicly supporting Sánchez de Lozada," one of the parties in this case, which undercuts the District Court's conclusion that the State Department had no other motive than to provide fair and accurate information. *See Niam v. Ashcroft*, 354 F.3d 652, 658 (7th Cir. 2004) (stating that the Seventh Circuit "and other courts have expressed concern" about reliance on State Department reports as "[t]he State Department naturally is reluctant to level harsh criticisms against regimes with which the United States has friendly relations").

gathered this information, or on who was responsible for reporting the intelligence, we can only conclude that the information reported in the cables was hearsay gathered or observed by third parties with no duty to report. *See Ransfer*, 749 F.3d at 925. The cables are essentially a "reporter's account of what eyewitnesses reported," which as we have held, is "forbidden by Rule 805." *Baker*, 432 F.3d at 1211 n.23.

The District Court failed to determine which statements in the cables reflect "the personal knowledge of the public official making the record or his agent or someone with a duty to report the matter to a public official," *Cent. Gulf Lines, Inc.*, 747 F.2d at 319, and which statements were made by third parties with no duty to report, *Mazer*, 556 F.3d at 1278. The District Court erroneously admitted the cables based on their trustworthiness and did not assess whether the statements contained within the cables were inadmissible hearsay. That erroneous application of the hearsay rules constitutes an abuse of discretion per se. *Henderson*, 409 F.3d at 1297. The cables, as submitted, are inadmissible.[29]

4.

---

[29] Portions of the cables may be admissible if the parties can show who reported the information in the cables or how the information was discovered. For example, one cable includes a statement that "all American companies in La Paz and El Alto with which [embassy officials] have been in contact are closed for the safety of their own employees." That factual conclusion appears to be based on the "knowledge or observations" of a government agent under a duty to report as opposed to a collection of statements made by third parties under no obligation to report and, as such, may be admissible. We need not undertake to identify all such potentially admissible statements as the cables, as a whole, should not have been admitted.

Defendants point to two out-of-circuit opinions to support the proposition that similar government reports are admissible under Rule 803(8). Neither opinion refutes our conclusion.

In *United States v. Gluk*, 831 F.3d 608, 614 (5th Cir. 2016), the Fifth Circuit held that when an "agency professional transmits a document to others outside the agency, that document is presumptively a factual finding of the agency." But the central issue there was whether the SEC had "declined to adopt the report," not whether the findings were based on the preparer's own observations or knowledge. *Id.* In fact, the Fifth Circuit explicitly refused to address the basis on which we find the cables in this case to be inadmissible, namely "whether some statements contained *within* the . . . documents could themselves be hearsay." *Id.* at 615 n.7.

In *Union Pacific Railroad Co. v. Kirby Inland Marine, Inc. of Mississippi*, 296 F.3d 671, 679 (8th Cir. 2002), the Eighth Circuit upheld the admission of an investigative report prepared by the Coast Guard even though "investigators relied on hearsay evidence to reach their conclusions." *Id.* (citing *Moss v. Ole S. Real Estate, Inc.*, 933 F.2d 1300, 1304 (5th Cir. 1991)). The Court held that the report, which found that a bridge was "an unreasonable obstruction to navigation," was a reliably prepared factual finding because its conclusions were based on a "thorough review process," which included "a preliminary investigation, detailed investigation, public hearing, and an administrative review." *Id.* at 673, 679.

57

Here, we have no indication of how the cables were prepared. We are unable to determine the process by which the information within the cables was gathered or reported. And even if the cables were reliably prepared, only the portions setting out the findings of the preparer should be admitted, not "any portion of the investigatory file which contains otherwise inadmissible evidence." *Moss*, 933 F.2d at 1310.

Other circuits have found State Department reports about the conditions in other countries admissible under the public-records exception. *See, e.g.*, *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 144 (2d Cir. 2000); *Niam*, 354 F.3d at 658; *see also Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1412 & n.5 (9th Cir. 1995) (considering country reports but noting that the opposing party waived any objection to their admissibility). Plaintiffs' specific contentions regarding the hearsay of unidentified sources and "unconfirmed rumors" about the situation in Bolivia make these cables inadmissible. And considering the cables "even though they are hearsay," *Niam*, 354 F.3d at 658, is not the standard in this Circuit. *See Mazer*, 556 F.3d at 1278; *see also* 7 Handbook of Fed. Evid. § 803:8 (8th ed.) ("Rule 803(8) does not provide a blanket hearsay exception for reports or statements made by non-public officials to public offices even when made pursuant to statutory duty.").

5.

Finally, Defendants argue that even if the District Court erred in admitting the cables, it was harmless because the cables corroborated what other uncontested evidence already demonstrated. We disagree—the admission of the cables affected Plaintiffs' substantial rights.

Defendants' argument that the cables show only that "there were specific crises at each of the locations where decedents were shot" is a sharp departure from their explanation of this evidence to the jury. In closing argument, Defendants argued that the cables were the "the most important piece[s] of evidence in this case" to demonstrate that the killings were not intentional. Defense counsel quoted specific "reports" from the cables that there was "increasing levels of violence, with the protesters now bringing dynamite and guns to bear" and that unidentified "[l]ocal residents fear looting and the danger of misdirected fire coming through windows or walls."[30] Defendants also used this evidence to attach the imprimatur of the U.S. government to their version of events, arguing that what the "State Department was telling the people in DC – and this is telling you" was the danger is "what happened, misdirected fire." Based on this explanation of the evidence to the jurors, who were to determine whether the

---

[30] Although such specificity was not necessary to preserve their objection to the admission of the cables, Plaintiffs objected and cited this statement as an example of hearsay in the cables because "[w]e don't know who fears looting, who's reporting this." Plaintiffs also argued that the statement was "pure speculation. There's no firsthand knowledge of this. It's not based on any understanding."

59

killings were intentional or not, we cannot conclude that the cables (and the hearsay within) did not "have substantial influence" on the judgment. *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S. Ct. 1239, 1248 (1946).[31]  We remand the case for a new trial on Plaintiffs' wrongful-death claims based on the inappropriate admission of the State Department cables.

### B.

Plaintiffs also argue that a new trial for their wrongful-death claims is warranted because the District Court erred in refusing to give their requested jury instruction.  The District Court instructed the jury that Plaintiffs had to prove that, for each relative, there was "[t]he willful and intentional killing of the relative by a Bolivian soldier."  The District Court denied Plaintiffs' request to include a statement that one "way to show intent is to show that a defendant knows that death is a probable result of this action, whether or not the defendant wanted to cause that particular death."  Plaintiffs' requested instruction was derived from language in a foreign attorney's declaration that they submitted to the District Court.

The District Court has "wide discretion" to instruct the jury.  *United States v. Starke*, 62 F.3d 1374, 1380 (11th Cir. 1995).  The District Court abuses its

---

[31] Defendants' arguments on appeal are further undermined by their contentions before the District Court that the probative value of the "misdirected fire" statement is "very high" and that it goes "squarely" to "one of the key issues in the case."

discretion by failing to give a requested instruction only when "(1) the requested instruction correctly stated the law, (2) the instruction dealt with an issue properly before the jury, and (3) the failure to give the instruction resulted in prejudicial harm to the requesting party." *Burchfield v. CSX Transp., Inc.*, 636 F.3d 1330, 1333–34 (11th Cir. 2011). Furthermore, it is not error to refuse a requested instruction when the substance of the proposal is covered by another instruction. *Wilkinson v. Carnival Cruise Lines, Inc.*, 920 F.2d 1560, 1569 (11th Cir. 1991). We will reverse only if, after reviewing the jury instructions "as a whole," "we are left with a substantial, ineradicable doubt as to whether the jury was properly guided in its deliberations in this regard." *United States v. Dohan*, 508 F.3d 989, 993 (11th Cir. 2007).

Plaintiffs base their wrongful-death claims on Articles 14 and 20 of the Bolivian Penal Code.[32] Although we have a translated copy of other provisions of the Bolivian Penal Code, the record is devoid of an English translation of Article 14. The parties agree, however, that Plaintiffs' requested instruction is "not a statement from the Bolivian Penal Code." The expert declaration of Paulino Verástegui Palao, a Bolivian attorney who is a self-professed expert in criminal law, is the only evidence in the record about the meaning of Article 14.

---

[32] The parties agree that Plaintiffs' claims are stated under Bolivian law and that under Bolivian law, the criminal code informs civil liability.

61

Defendants did not refute any of Verástegui's conclusions, nor did they submit any other evidence regarding the interpretation of Article 14. Defendants argue that the District Court did not err in refusing the instruction because it is not a statement from the Bolivian Code, and the Court did not abuse its discretion in refusing to allow Plaintiffs to place their own interpretative gloss on the Bolivian law.

Because the District Court committed reversible error by admitting the State Department cables, we need not decide whether Plaintiffs are also entitled to a new trial on the basis of the rejected jury instruction. *See Burchfield*, 636 F.3d at 1338. We do note that Federal Rule of Civil Procedure 44.1 enables a court to "consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence" to determine the meaning of foreign law. "[A]n un-rebutted affidavit from an attorney on foreign law [is] sufficient to establish the substance of that law." *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1165 (11th Cir. 2009). But neither the District Court nor this Court is required to take those conclusions at face value. *Id.* A court can "engage in its own research and consider any relevant material thus found" or to "insist on a complete presentation by counsel," but is not obligated to take any such action. Fed. R. Civ. P. 44.1 advisory committee's notes to 1966 amendment. We remand the case for further proceedings.

*        *        *

62

For the foregoing reasons, the judgment below is **VACATED** and

**REMANDED** for further proceedings not inconsistent with this opinion.